## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 13 B 7001 |
| | ) | Chapter 11 |
| LHC, LLC, | ) | Judge Donald R. Cassling |
| | ) | |
| Debtor. | ) | |

### MEMORANDUM OPINION

When the owner of a Chapter 11 debtor is also the chief customer of that debtor, does the owner's dual role automatically constitute "cause" for appointing a Chapter 11 trustee under 11 U.S.C. § 1104(a)(1)? The Debtor's largest secured creditor, Wells Fargo Bank, N.A., urges this Court to answer that question in the affirmative. Wells Fargo also insists that even if the Court's answer is no, the owner should still be replaced with a Chapter 11 trustee because the owner has allegedly (1) proven itself incompetent to operate or reorganize the debtor, (2) flouted the orders of this Court, and (3) forfeited the trust and confidence of Wells Fargo. For the reasons that follow, the Court rejects Wells Fargo's primary argument both as a general legal proposition and under the particular facts of this case. In addition, the Court finds that Wells Fargo failed to establish by clear and convincing evidence that there either is "cause" to appoint a Chapter 11 trustee under § 1104(a)(1) or that it is in the interests of all creditors, equity security holders, and other interests of the estate to appoint a trustee under § 1104(a)(2).

### I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

## II. SYNOPSIS OF THE FACTS AND ARGUMENTS

LHC, LLC (the "Debtor") was formed as an Illinois limited liability company on November 8, 2006. The Debtor is a not-for-profit enterprise that owns and operates a three-sheet ice-skating rink in West Dundee, Illinois, known as the "Leafs Ice Centre" (the "Rink"). The Rink sells ice time to various skating organizations in Illinois as well as to the general public. The sole member of the Debtor and largest customer of the Rink is the Leafs Hockey Club (the "Club"), an amateur hockey organization. Although the Debtor is a taxable limited liability company, its income is passed through to the Club. The Club does not pay tax on the income received from the Debtor because the Debtor is a non-profit company. The Debtor owes $20 million to bondholders represented by Wells Fargo, the indenture trustee for the bondholders. The Club has guaranteed repayment of that debt.

Wells Fargo argues that under § 1104(a)(1) the Court is required as a matter of law to appoint a Chapter 11 trustee where the Club is both owner and customer of the Debtor, because it must be presumed as a matter of law that the Club will always elevate its interests as customer over its interests as owner of the Debtor. In support of this argument, Wells Fargo proffered the expert testimony of Edward B. Cordes, a CPA and certified fraud examiner. Mr. Cordes opined that the Club's economic self-interest requires it always and invariably to advance its own economic interests at the expense of the Debtor, its creditors and its other customers. In response, the Debtor argues that the conflict of interest issue is not a purely legal issue. According to the Debtor, the facts show the Club's interests are consistent with those of the Debtor, and the Debtor has therefore acted in the best interests of its creditors and customers, even while pursuing the Club's economic interests as well as its own.

Independent of its conflict-of-interest argument, Wells Fargo argues that cause exists for

a number of other reasons to appoint a Chapter 11 trustee under § 1104(a)(1).  Specifically, Wells Fargo alleges that the Debtor:  (1) failed to maintain proper accounting records; (2) improperly purchased goods and services on the eve of bankruptcy, rather than waiting to do so under the auspices of the bankruptcy court; and (3) violated the terms of certain cash collateral orders.  Finally, Wells Fargo argues that it would be in the interests of creditors, equity security holders, and other interests of the estate to appoint a trustee under § 1104(a)(2) because the Debtor's inherent conflict of interest with the Club, its managerial incompetence, its failure to communicate, and its lack of transparency have all caused Wells Fargo to lose confidence in the Debtor's ability to operate and reorganize.

The Debtor responds that it was forced to recreate its books and records from scratch when its former management company was replaced and refused to turn over the accounting records it had maintained theretofore.  The Debtor states that it has now successfully recreated those records and instituted internal controls that will ensure that the records will be complete and accurate as this case progresses.  The Debtor justifies its pre-petition purchases of goods and services as being necessary for health and safety reasons as well as for the Debtor's future financial welfare.  The Debtor argues that it has complied with the cash collateral orders and that Wells Fargo's arguments to the contrary are based upon a misinterpretation of the terms of those orders.  Finally, the Debtor states, given Mr. Cordes's complete access to and constant monitoring of its records and activities on Wells Fargo's behalf, Wells Fargo can hardly complain of a lack of transparency or communication.

For the reasons that follow, the Court concludes that Wells Fargo failed to establish by clear and convincing evidence that a Chapter 11 trustee should be appointed under either § 1104(a)(1) or (a)(2).

### III. STATEMENT OF FACTS

#### *The Debtor and its Corporate Organization*

The Debtor has a five-member board of managers,[1] all of whom were appointed by the

Club. Prior to December of 2012, three of the board members were also members of the Club;[2]

two were not.[3] As described in more detail below, the entire Board of Managers was replaced in

December of 2012 with five members of the Club.

#### *Wells Fargo, Indenture Trustee for the Bonds*

The money needed to acquire the land for the Rink and to build and equip it was financed

by $20 million in Sports Facility Revenue Bonds Series 2007A Taxable Series 2007B (the

"Bonds") issued on February 1, 2007 by the Illinois Finance Authority (the "Authority").

Proceeds of the Bonds were also to be used to: (1) pay capitalized interest on the Bonds for a

period after the completion of construction of the Rink; (2) fund a debt service reserve fund; and

(3) pay the costs of issuing the Bonds.

The Club guaranteed payment of the principal and interest on the Bonds pursuant to a

guaranty agreement dated February 1, 2007. The Bonds are also secured by a mortgage,

assignment of leases and rents, security agreement and fixture filing, all dated February 1, 2007.

The Amalgamated Bank of Chicago was the original trustee (the "Original Trustee") until it was

replaced by Wells Fargo on August 9, 2009. Pursuant to the indenture, the Authority pledged

and assigned to the Original Trustee, as security for the Bonds, all of the Authority's right, title,

and interest in and to, inter alia, the amounts payable under the indenture and loan agreement

(excluding certain unassigned rights) and all amounts payable in respect to the indebtedness

---

[1] The Club has a board of directors separate and apart from the Debtor's board of managers. In or about 2008, Michael Durkin's term as president on the Club's board of directors expired, but he continued to serve as the president of the Club and remained on the Debtor's board of managers. Mr. Durkin was eventually replaced by Danielle Gulli as the president of the Club.

[2] Michael Durkin, Terry Nolan, and Danielle Gulli were all Club members.

[3] John Willett and Don LaPato were not Club members.

evidenced by the loan agreement and the indenture.

### The Board of Managers is Replaced

On December 11, 2012, the Club replaced the entire board of managers of the Debtor. The board positions of Michael Durkin (director/president), John Willet (director/treasurer), Don LaPato (director), Terry Nolan (director/secretary), and Danielle Gulli (director) were all terminated. The new Board consisted of five Club members: (1) Peter Buh (director/president); (2) Steve Goluch (director/CFO); (3) Michael Greco (director); (4) RJ Grewal (director/secretary); and (5) Ed McHale. At the time of filing, RJ Grewal was the secretary of the Club, and the interim operations representative for the Debtor. He has since been elected to serve as the president of the Club.

### Wells Fargo Files a Foreclosure Action

On December 28, 2012, shortly after the board of managers was replaced, Wells Fargo filed a foreclosure proceeding against the Debtor in the Circuit Court of the Sixteenth Judicial Circuit, Kane County, Illinois.[4] A hearing to appoint a receiver in the foreclosure proceeding was scheduled for February 25, 2013. Wells Fargo and the Debtor were negotiating terms of a potential forbearance with respect to such hearing until approximately 1:30 p.m. on Friday, February 22, 2013, when counsel to Wells Fargo informed the Debtor's counsel of its withdrawal from forbearance negotiations and its intent to proceed with the hearing to appoint a receiver.

---

[4] There was no evidence introduced at trial explaining why Wells Fargo filed the foreclosure action in December 2012, even though the Debtor had been in default of its bond payments since 2010. Virginia Housum, a vice president in the corporate trust department at Wells Fargo, was responsible for the Debtor's bond payment compliance. The facts that the lawsuit was filed contemporaneously with the change in the Debtor's management structure and Ms. Housum expressed great discomfort with that change suggest that Wells Fargo filed the foreclosure action in part because the Debtor had replaced its board of managers without Wells Fargo's prior knowledge or consent.

### *Replacement of the Debtor's Prior Management*

While the foreclosure proceeding was pending, the Debtor's new board of managers decided that the Debtor needed to take dramatic action to reverse its poor financial condition:

First, on February 4, 2013, it replaced Club Sports Consulting Group, Inc. ("CSCG") the professional management company that previously operated the Rink and replaced it with Fairview Facilities Management, LLC ("Fairview") pursuant to the terms of a professional management services agreement. (Ex. No. 16.)

### *The Rink Conditions When Fairview Assumed Management Responsibilities*

Paul O'Dacre is an employee of Fairview, the current general manager of the Rink, and he has extensive experience managing ice rinks. Mr. O'Dacre testified that when he became the general manager on February 4, 2013, the Rink was in disrepair. His testimony as outlined below was unrefuted by Wells Fargo and is therefore accepted by the Court as an accurate representation of the conditions at the Rink when Mr. O'Dacre and Fairview assumed responsibility for its operation:

- *Lighting at the Rink was inadequate:* Some of the lights in the parking lot and on the exterior of the Rink were malfunctioning. Lights in the lobby were not operable, and eight sets of lights in the three arenas at the Rink were burned out.

- *The security cameras were not functioning properly:* Several cameras had been removed, and the remaining cameras were not operating properly. In addition, he testified that the server for the security system had been removed from the main office.

- *The Rink was in serious disrepair:* The ice, which should have been 1-½ to 1-¾ inches thick, was instead 6 to 7 inches thick. As a result of the extra ice, the piping and the boards in the Rink were being damaged, and the thresholds that separated the ice from the surrounding areas were non-existent. There were gaps in the ice and boards that surround the arenas, which Mr. O'Dacre testified would pose a danger to players if they hit those boards. Mr. O'Dacre testified about a specific incident where a player from Team Illinois hit the unstable boards, crashed through them and hit the bench area, suffering an injury that required a trip to the hospital.

- *Excessively thick Rink ice significantly increased the Debtor's utility costs:* Mr. O'Dacre testified that the cooling tower leaked approximately one gallon of water every minute, and that this leak led to increased utility costs for the Debtor. He further testified that if the cooling tower was not repaired, it would have to be replaced. The replacement cost for the cooling tower, according to Rink-Tec International, Inc. ("Rink-Tec"),[5] was approximately $10,000.

- *The HVAC system was malfunctioning:* As a result of these malfunctions, the locker rooms and the arenas were much too hot while the offices were much too cold. The filters of the system had not been changed for approximately 18 months. The compressors used to keep the ice at a proper temperature were not staged, and as a result they were inefficiently firing up simultaneously, increasing utility costs.

- *Many other problems had been caused or tolerated by prior management:* There was insufficient staff to properly clean the Rink. There was a tree growing on the roof and the roof leaked so badly that players could not use certain benches in one of the arenas. The building was unkempt, dirty and in a state of general disrepair. The bathrooms were not properly functioning. In addition, the "shooting area" on the second floor was deemed uninhabitable by the village inspector because it was constructed without a permit and because the service elevator was inoperable. (See Ex. No. 64.)

- *The poor condition of the Rink made it generally unsafe:* Because the glass that held the boards was not securely fastened, it was dangerous if players hit those boards. Mr. O'Dacre testified that Team Illinois broke a piece of glass during a hockey game, and, inconsistent with standard expectations, the Rink did not have a store of properly sized replacement glass. The areas surrounding the arenas were unsafe due to the problems with the boards; the gates would not open properly. The doors used by the Zamboni to enter the arenas would not close without the use of a sledge hammer. Mr. O'Dacre further stated that these issues with the Rink needed to be addressed because they rendered the Rink unsafe and posed a significant liability risk.

### The Debtor's Pre-Petition Capital Expenditures

In the period shortly preceding the Debtor's bankruptcy petition, the Debtor made a number of capital expenditures designed to correct some of the more serious problems noted by Mr. O'Dacre. These purchases and expenditures included: (1) a scissor lift; (2) new lighting for the Rink; (3) modifications to the security cameras; (4) the purchase of new office furniture; (5)

---

[5] Rink-Tec was hired by the Debtor to repair the cooling tower and to ensure proper ice levels and temperatures.

the purchase of two arcade games; (6) upgrades to the concessions computer system; (7) repairs to the cooling tower; (8) repairs to the boards and glass surrounding the arenas; (9) paying for extra employees not employed by the Debtor;[6] and (10) repairs to the HVAC system. While none of these expenditures are alleged to have been preferences or fraudulent conveyances, Wells Fargo argues that the Debtor should not have made them until it had filed for bankruptcy, so that the decision to incur those debts would have been made under the auspices of the bankruptcy court.

In his testimony, RJ Grewal, the interim operations representative of the Debtor and the president of the Club, gave two explanations in response to Wells Fargo's assertion that the Debtor should have waited until filing for bankruptcy to incur these expenses. First, he testified that the Debtor did not know until February 25, 2013, that it would be filing for bankruptcy. Until that date, it had been working with Wells Fargo on a forbearance agreement. Wells Fargo offered no evidence to the contrary and the Court accepts Mr. Grewal's testimony that the Debtor made the expenditures in response to Mr. O'Dacre's analysis of what the Rink needed in order to operate safely and efficiently, and not in anticipation of bankruptcy.

Second, Mr. Grewal testified that the Rink's defects identified in Mr. O'Dacre's testimony were so serious that it was prudent for the Debtor to make the following capital expenditures:

- From *Metro Lift, Inc.* the Debtor purchased a scissor lift to replace one that was inoperable, and without which the Debtor could not provide licensees and customers with safe and proper lighting.

- From *Sustainable Lighting Solutions, Inc.* the Debtor purchased an improved lighting system. The old lighting in the Rink was insufficient, outdated and inefficient. The timing of this purchase also allowed the Debtor to take advantage of a $20,000 Commonwealth Edison ("ComEd") rebate program.

---

[6] There was unrebutted testimony that the additional employees from Centrum East West Arenas Ventures LLC were needed to help bring the Rink back into good working order.

- *MSI, Inc.* was hired to repair the Rink's HVAC system and repair gas leaks.  Mr. Grewal testified that the Rink had two gas leaks and that certain areas of the Rink were improperly heated or cooled.

- *Thom Infotech* was hired to repair and replace the missing and inoperable security system equipment.  This equipment is necessary for the proper operation of the Rink.  It is especially important to mitigate the Rink's liability.

- From *Business Office Systems,* the Debtor purchased furniture for an office previously used by only one person.  The additional furniture made it possible for more than one employee to use the office, which was required to properly manage the Rink.

- From *Innovative Concepts in Entertainment,* the Debtor purchased two arcade games for the Rink's lobby.  Mr. Grewal testified that he believed that these arcade games would instantly start generating revenue for the Rink.

- *Rink-Tec* was hired to repair the cooling tower and to ensure proper ice levels and temperatures.  Mr. Grewal testified that the repairs to the cooling tower, the reduction in ice thickness, and the maintenance of proper ice temperatures would all reduce the Debtor's monthly utility costs.

- *Becker Arena Projects* was hired to repair the boards and glass surrounding the arenas.  Mr. Grewal testified that the boards and glass were in poor condition and that these repairs were necessary for the safety of the players and to mitigate the Debtor's liability.

- *JD Computers, Inc.* was hired to upgrade the computer system for the concessions area.  Mr. Grewal testified that the new Point of Sale system was necessary to better track the revenue for the concessions area.

- *Centrum East West Arenas Ventures LLC* was hired because Fairview needed additional trained employees in order for the Rink to function properly.

### *The Debtor Files for Bankruptcy*

On February 25, 2013, prior to the scheduled hearing to appoint a receiver in the foreclosure proceeding, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date").  The Debtor has since been operating its business and managing its financial affairs as a debtor-in-possession.  No trustee or examiner has been appointed to serve in the Debtor's bankruptcy case.

On March 29, 2013, Wells Fargo filed its motion to appoint a trustee under § 1104(a).[7] The Court held a six-day evidentiary hearing to consider Wells Fargo's motion. Wells Fargo retained Cordes and Company for purposes of examining the financial records of the Debtor. Edward B. Cordes issued a report on May 13, 2013.  Mr. Cordes, a CPA and certified fraud examiner, was qualified by the Court as an expert to opine on matters that relate to forensic accounting and business strategies relating to distressed entities.   The Debtor retained Michael D. Pakter to examine its financial records and internal controls.  He issued his report on May 10, 2013.  Mr. Pakter, also a CPA and certified fraud examiner, was qualified by the Court as an expert in forensic accounting and business strategies for distressed entities.

## IV. APPLICABLE STANDARDS

### A. The Appropriate Burden of Proof – Clear and Convincing Evidence

The moving party has the burden of proving grounds that justify the appointment of a Chapter 11 trustee and, in doing so, must overcome a strong presumption that the debtor is to remain in possession. *In re Madison Mgmt. Grp., Inc.*, 137 B.R. 275, 281 (Bankr. N.D. Ill. 1992).  Neither the United States Supreme Court nor the Seventh Circuit Court of Appeals has determined the appropriate burden of proof for appointment of a Chapter 11 trustee.  Several bankruptcy courts in this district have applied the clear and convincing standard. *Raymond Prof'l Grp., Inc. v. William A. Pope Co. (In re Raymond Prof'l Grp., Inc.)*, 421 B.R. 891, 909 (Bankr. N.D. Ill. 2009); *In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994), *aff'd.*, Nos. 94 C 5089, 94 C 5090, 94 C 5091, 1994 WL 687474 (N.D. Ill. Dec. 8, 1994); *Madison Mgmt.*, 137 B.R. at 281; *In re Sanders*, Bankr. No. 99 B 9876, 2000 WL 329574, at *3 (Bankr. N.D. Ill. Mar. 2, 2000).[8]   A minority of courts from other jurisdictions apply the

---

[7] The previous day, on March 28, 2012, Wells Fargo filed a proof of secured claim for $21,052,713.25.

[8] The Second and Third Circuits have also concluded that the appropriate standard of proof is clear and convincing

preponderance of the evidence standard. *See In re Keeley & Grabanski Land P'ship*, 455 B.R. 153, 162-163 (B.A.P. 8th Cir. 2011); *Tradex Corp. v. Morse*, 339 B.R. 823, 829 (D. Mass. 2006); *In re Veblen West Dairy LLP*, 434 B.R. 550, 555-56 (Bankr. D.S.D. 2010).

Applying the clear and convincing evidence standard appears to the Court to be more consistent with the presumptions that a debtor should generally be permitted to remain in control and possession of its business and that the appointment of a Chapter 11 trustee is an extraordinary remedy. *See In re Berwick Black Cattle Co.*, 405 B.R. 907, 912 (Bankr. C.D. Ill. 2009). In light of those presumptions, the lack of direction from either the Supreme Court or the Seventh Circuit, and the split in authority among the circuits, the Court will apply the higher standard of proof—clear and convincing evidence.

Appointment of a trustee is a fact-sensitive determination that must be made on a case-by-case basis. *In re 4 C Solutions, Inc.*, 289 B.R. 354, 370 (Bankr. C.D. Ill. 2003). In making this determination, the court may examine both pre- and post-petition conduct. *Oklahoma Refining Co. v. Blaik (In re Oklahoma Refining Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988). A determination of whether "cause" exists to appoint a trustee "is within the discretion of the court and due consideration must be given to the various interests involved in the bankruptcy proceeding." *Bellevue Place*, 171 B.R. at 623.

### B. The Statutory Basis for Appointment of a Chapter 11 Trustee — § 1104(a)

Section 1104(a) of the Bankruptcy Code provides the statutory basis for the appointment of a trustee in a Chapter 11 case:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United State trustee, and after notice and a hearing, the court shall order the appointment of a trustee —

---

evidence. *Adams v. Marwil (In re Bayou Grp., LLC)* 564 F.3d 541, 546 (2d Cir. 2009); *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 385 F.3d 313, 317-18 (3d Cir. 2004).

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

### 1. Appointment of a Trustee for "Cause" Under § 1104(a)(1)

A court "shall" appoint a Chapter 11 trustee if it determines that there is "cause" to do so under § 1104(a). Unfortunately, that section does not define "cause," but instead offers a non-exhaustive list of conditions that may each establish "cause" to appoint a trustee: fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management. *Ontario Entm't Corp. v. Chicago Title & Trust Co. (In re Ontario Entm't Corp.)*, 237 B.R. 460, 472 (Bankr. N.D. Ill. 1999). In examining whether a particular set of circumstances amounts to "cause" under § 1104(a)(1), courts may also take into account whether: (1) the alleged misconduct was material; (2) the debtor treated insiders and affiliated entities better or worse than other creditors or customers; (3) the debtor made pre-petition voidable preferences or fraudulent transfers; (4) the debtor was unwilling or unable to pursue causes of action belonging to the estate; (5) conflicts of interest on the part of management interfered with its ability to fulfill its fiduciary duties to the debtor; and (6) management engaged in self-dealing or squandering of corporate assets. *In re Intercat, Inc.*, 247 B.R. 911, 921 (Bankr. S.D. Ga. 2000).

Courts have found the existence of "cause" under a variety of circumstances. For example, cause was established where a debtor-in-possession failed to keep adequate records,

failed to file reports, and engaged in a history of questionable transactions with affiliated companies. *See Oklahoma Refining*, 838 F.2d at 1136 ("There are many cases holding that a history of transactions with companies affiliated with the debtor company is sufficient cause for the appointment of a trustee where the best interests of the creditors require."). Cause, in the form of an irreconcilable conflict of interest, was found when a debtor-in-possession had an interest in a company attempting to acquire technology of the debtor and had engaged in self-dealing. *See In re Embrace Sys. Corp.*, 178 B.R. 112, 128-29 (Bankr. W.D. Mich. 1995); *see also In re L.S. Good & Co.*, 8 B.R. 312, 315 (Bankr. N.D. W.Va. 1980) (finding that conflicts of interest and remote prospects for rehabilitation constituted cause for appointment of a trustee). In addition, because debtors-in-possession are fiduciaries of the estate, a breach of their fiduciary duties may constitute cause. *See In re Russell*, 60 B.R. 42, 47-48 (Bankr. W.D. Ark. 1985).

Finally, although courts are directed to appoint a trustee once "cause" has been established, the determination of whether cause has been established is solely within the discretion of the court. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989).

### 2. Appointment of a Trustee Under the "Interests" Standard of § 1104(a)(2)

Even where § 1104(a)(1) cause has not been established, a court *may* appoint a trustee if it determines that such appointment is "in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor." 11 U.S.C. § 1104(a)(2). The case law interpreting § 1104(a) has concluded that the appointment standards are more flexible under subsection (a)(2) than under subsection (a)(1). *Tradex*, 339 B.R. at 829; *Bellevue Place*, 171 B.R. at 623.

Determining whether appointment of a trustee is in the interests of the various

constituencies of the estate is fact-specific and requires the court to balance the benefits of such

an appointment against its anticipated costs. *See Sanders*, 2000 WL 329574 at *5. The factors

that have been considered include: (1) the trustworthiness of the debtor; (2) the debtor's past and

present performance and prospects for rehabilitation; (3) whether the business community and

creditors of the estate have confidence in the debtor; and (4) whether the benefits outweigh the

costs. *Madison Mgmt.*, 137 B.R. at 282. Appointment of a trustee under § 1104(a)(2) is within

the sound discretion of the bankruptcy judge. *Tradex*, 339 B.R. at 829; *Bellevue Place*, 171 B.R.

at 623.

## V. DISCUSSION

### A. Whether the Debtor Has an Inherent Conflict of Interest with the Club That Requires Appointment of a Trustee for "Cause"

Wells Fargo argues that "cause" exists under § 1104(a)(1) to appoint a trustee because

there is an irresolvable conflict of interest between the Club and the Debtor. The legal principles

underlying its argument are straightforward:   The debtor-in-possession serves in a fiduciary

capacity with fiduciary duties to all of its creditors. *Sanders*, 2000 WL 329574, at *4; *Bellevue*

*Place*, 171 B.R. at 623. This obligation includes a duty of care, a duty of loyalty, and a duty of

impartiality. *In re Eurospark Indus., Inc.*, 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010); *In re*

*Bowman*, 181 B.R. 836, 843 (Bankr. D. Md. 1995); *Bellevue,* 171 B.R. at 624. "The duties to

avoid self-dealing, conflicts of interest and the appearance of impropriety are encompassed in the

concept of duty of loyalty." *Bowman*, 181 B.R. at 843. If the debtor clearly appears incapable of

discharging those duties, appointment of a trustee is not only warranted but required. *Sanders,*

2000 WL 329574, at *5; *In re Nautilus of New Mexico, Inc.*, 83 B.R. 784, 789 (Bankr. D.N.M.

1988).

Wells Fargo argues that the following allegations mandate appointment of a trustee under

those legal principles: (1) the Debtor is the landlord of the Club; (2) the Debtor's board of managers consists entirely of members of the Club; (3) the Debtor offered lower ice rental rates and preferential ice time to the Club; (4) there is no formal written ice rental agreement between the Debtor and the Club, and the Debtor stretched out the Club's payments; and (5) an executive of the Club participated in the negotiations of ice rental agreements with the Debtor's other customers. The Court addresses each of these allegations in turn.

### 1. Whether There Exists a Tenant/Landlord Relationship Between the Debtor and the Club That Creates an Inherent Conflict of Interest.

Wells Fargo first argues that a conflict of interest arises because the Debtor, the landlord of the Rink, is controlled by the Club, a tenant of the Debtor. Wells Fargo cites *In re Suncruz Casinos, LLC*, 298 B.R. 821 (Bankr. S.D. Fla. 2003) for the proposition that where the debtor is a landlord and the debtor's sole ownership group is a tenant, that relationship creates an inherent conflict of interest that results in "cause" to appoint a trustee.

The factual premise for Wells Fargo's argument is false because Wells Fargo has failed to establish that there is a landlord/tenant relationship between the Debtor and the Club. The Club is merely a *customer* of the Rink and pays for *services* that include partial use of the Debtor's ice, to be shared with the other customers of the Rink. The relationship between the Debtor and the Club could more properly be described as that of a licensee and a property owner much like the relationship of a bowling league to a bowling alley whose lanes it uses one night a week. However one characterizes the relationship between the Debtor and the Club, it is not a landlord/tenant relationship of the type involved in the *Suncruz Casinos* case. In addition, Wells Fargo's landlord/tenant analogy overlooks another crucial relationship between the Debtor and the Club, that of debtor/guarantor. Because the Club is a guarantor of the Debtor's bond debt, there is a unity of interests that would ordinarily be absent from a tenant/landlord relationship.

The landlord/tenant analysis fails for other reasons, as well. There is no written *lease* agreement between the Club and the Debtor or, indeed, between the Debtor and any of its other customers. (*See* Ex. No. 5.) The Debtor has a formal written agreement for ice time with Team Illinois, its second largest customer.[9] (Ex. No. 13.) Significantly, the Team Illinois agreement refers to a *license* to use a particular amount of ice time each month, not to a *lease* of the Rink. (*Id* at ¶ 4.) Nowhere in that document is there any language to suggest that the Debtor is a landlord with respect to Team Illinois. The written contract between Team Illinois and the Debtor establishes at most a licensee/licensor relationship. The Debtor's relationship with the Club, as a customer, is indistinguishable from the Debtor's relationship with Team Illinois; therefore, the Court rejects Wells Fargo's argument that the relationship between the Club and the Debtor constitutes a landlord/tenant relationship.

Because the Court rejects Wells Fargo's characterization of the Club's relationship with the Debtor as that between a tenant and a landlord, Wells Fargo's reliance upon *Suncruz Casinos* is misplaced. However, even if the Court were to find that such a relationship existed, Wells Fargo misstates the holding in that case. *Suncruz Casinos* stands for the proposition that if the debtor is a tenant and the debtor's sole owner is its landlord, this is one factor, among many, that will be weighed when deciding to appoint a Chapter 11 trustee. *Id. at 830-32.*

Finally, *Suncruz Casinos* is distinguishable on its facts.[10] In *SunCruz Casinos* there was evidence of multiple disputes between the landlord and the tenant. These disputes led to bitter litigation between them including, the debtor's inability to reach an agreed-upon Chapter 11 plan

---

[9] Mr. Grewal also testified that the Debtor has a formal written agreement with Crystal Lake South High School.
[10] Another obvious factual distinction is that the debtor in *SunCruz Casinos* was the *tenant* and not the landlord. When the debtor is a tenant of its landlord owner, there is a significant risk that a conflict of interest will be acted upon because a landlord can act to the detriment of its tenant without any substantial detrimental impact upon itself. In this case, any actions the Club takes that would negatively impact the Debtor would be detrimental to the Club because the Club is ultimately responsible to pay back the Debtor's bond debt. This is evidenced by the Club's guaranty of the Debtor's bond debt.

with the landlord. *Id.* By contrast, the Club's guaranty of the Debtor's debt to Wells Fargo gives the Club and the Debtor the common goal of ensuring that the Debtor succeeds financially and makes it unlikely that such disputes would ever occur in this case. For these reasons, the Court finds the *Suncruz Casinos* case distinguishable.

### 2. Whether the Fact That the Debtor's Board of Managers Consists Entirely of Club Members is Evidence of an Inherent Conflict of Interest

The Court also finds unpersuasive Wells Fargo's argument that cause exists to appoint a trustee because the Debtor's board of managers consists entirely of Club members. It is undisputed that the Club is the sole entity in control of the Rink. However, that fact alone is not sufficient to prove that there is a conflict between their positions. Instead, the facts established at trial show that the interests of the Debtor and the Club are remarkably aligned and that the actions taken by the Club with respect to the Rink's operations have in fact benefitted both the Club and the Debtor.

For example, Mr. Grewal testified that the Club has financially supported the Rink since its inception. This support is evidenced by: (1) the Club financed the purchase of a Zamboni machine for the Debtor; (2) it made a $10,000 contribution to the Debtor's figure-skating program; (3) it purchased a copy machine for the Rink; and (4) most significantly, it executed a guaranty of the Debtor's bond debt.

Wells Fargo did not dispute these facts at trial, but it argues that the Club's guaranty of the Debtor's Bonds is meaningless because the Club does not have the funds necessary to honor the guaranty in full. It does not follow, however, that the Club's guaranty is meaningless. If anything, the Club's lack of adequate funds to honor the guaranty in full only proves that the Club's very survival depends upon the Debtor's ability to pay the debt. The Club's guaranty ensures that the Club and the Debtor shall sink or swim together.

Wells Fargo argues that when the Club removed Mr. LaPato and Mr. Willet, the only two members of the board of managers who were not Club members, the Club cemented total control over the Debtor, and this control creates a conflict of interest. The evidenced adduced at trial demonstrated that the Club controls the Debtor. However, this control does not itself create a conflict of interest.

In addition, the undisputed evidence shows that replacement of these two former board members cured actual conflicts of interest that had been exploited by Messrs. Willett and LaPato to the detriment of the Debtor. For example, in addition to being a member of the previous board, Mr. Willet was the treasurer of Crystal Lake South High School. He used his position as board member to benefit Crystal Lake South High School to the Debtor's detriment by negotiating for his high school the cheapest ice rental rates of any customer, whereas the Club has always paid the highest rates of any licensee.

The removal of Mr. LaPato from the board of managers cured multiple conflicts of interest. The evidence was undisputed that Mr. LaPato employed various family members at the Rink and some of these employees were paid by the Debtor for work done at other rinks. The undisputed testimony of Michael D. Pakter, the Debtor's expert witness, was that many of the previous management's expenses, including charges for golf outings, restaurant meals, gas station purchases, and bar purchases did not appear to be proper business expenses. Indeed, Mr. Pakter also testified that CSCG, the Debtor's previous management, paid invoices that had home addresses of former managers, including Mr. LaPato. Mr. Pakter further testified that CSCG apparently used Rink funds to pay referees for games at facilities other than the Rink. Mr. Pakter was not aware of any reason why the Rink should have been required to pay for any of these expenses.

The Club's control of the Debtor by itself does not create a conflict of interest because it is in the best interests of both the Debtor and the Club to take all steps necessary to ensure the financial health of the Debtor.  Moreover, the Debtor is a closely-held entity whose reputation and goodwill are closely identified with its owners because the success of the Club is inextricably tied to the success of the Debtor:  "The preference for retention of current management is stronger where the Debtor is a closely-held entity whose reputation and good will is closely identified with its owners and/or management team." *4 C Solutions,* 289 B.R. at 370. For this reason, the Court finds a strong preference to retain current management over the appointment of a trustee, and the Court finds that Wells Fargo has not introduced enough evidence to overcome that preference.

### *3. Whether the Debtor's Offer to the Club of a Lower Ice Rental Rate and Preferential Ice Time is Evidence of Self-Dealing*

Wells Fargo next alleges that the Club pays a below-market rate for ice time at the Rink and this fact demonstrates that the Club has acted upon a conflict of interest to the detriment of the Debtor.  The problem with this argument is that neither party introduced evidence which would show the relevant market price for ice time for long-term customers.  Instead, Mr. Grewal testified without contradiction that the Club's current payment of $325 per hour is the highest rate paid by any of the Debtor's licensees.  His unrebutted testimony removes the factual basis for Wells Fargo's claim of self-dealing.

Wells Fargo also argues that the Club has acted against the Debtor's interests by attempting to negotiate preferential ice times and a lower effective rate.[11]  But all customers seek preferential ice time and lower rates.  There was no evidence presented during the trial that the Club has enjoyed an unfair advantage in these negotiations or that the Club in fact receives the

---

[11] Those negotiations were ongoing at the time the trial took place.

most preferred ice time.   Therefore, the Court finds no evidence of self-dealing.

### 4. Whether the Lack of a Formal, Written Ice Rental Agreement Between the Debtor and the Club and the Debtor's Offer to Stretch Out the Club's Payments Are Evidence of Self-Dealing

Wells Fargo alleges that self-dealing is demonstrated by the lack of a formal, written ice rental agreement between the Debtor and the Club, and by the Debtor's agreement to allow the Club to stretch out its ice time for equal monthly payments without regard to actual ice time used in any particular month.   It is undisputed that the Club has never had a written, executed agreement with the Rink under either the prior or current management. (Ex. No. 5.) But this fact does not establish self-dealing because Mr. Grewal testified without contradiction that the Club has paid its bills every month since the inception of the Rink.  Mr. Grewal further testified that the Debtor is currently negotiating a formal written agreement for the Club's ice time.

Nor is there merit to Wells Fargo's claim that the Club's scheduled payments were stretched out without consideration.  Mr. Grewal testified that the Club had previously paid the Debtor on a monthly basis based on actual ice time used during that month.  The Debtor asked the Club to spread out its payments evenly over the course of the year in order to mitigate the natural annual drop-off in revenue in the summer months and thereby create a more predictable cash flow for the Debtor.   The Court finds that this benefit to the Debtor provided adequate consideration for the agreed-upon alteration to the Club's payment schedule.

### 5.  Whether the Presence of a Club Executive During Negotiations of Ice Rental Agreements with Other Customers is Evidence of Self-Dealing

It is undisputed that in current negotiations between the Debtor and Team Illinois for ice rates and times, the Debtor's general manager, Paul O'Dacre, received input from Danielle Gulli, a Club executive and the former president of the Club.[12]  Wells Fargo argues that Ms. Gulli's

---

[12] Wells Fargo attempted to argue that Ms. Gulli played a significant role in these negotiations, pointing to an email

input was improper and evidence of the Club's self-dealing. However, Wells Fargo introduced

no evidence that Ms. Gulli actually played a decisive role in these negotiations and Mr. Grewal

testified that Ms. Gulli has played no official role with the Debtor since December 2012, nor did

she impact the negotiations regarding Team Illinois's ice rates.

The Court finds that there was no evidence that Ms. Gulli's access to information during

the negotiations for ice time between the Debtor and Team Illinois adversely impacted those

negotiations. Moreover, because of the Club's guaranty of the Debtor's indebtedness to Wells

Fargo, it is in the Club's self-interest to ensure the Debtor's success. No evidence was

introduced to suggest that the Club took any actions inconsistent with the Debtor's interests in

reaching fair agreements with all of the Debtor's licensees.

For all of these reasons, the Court finds that Wells Fargo failed to demonstrate by clear

and convincing evidence that the Debtor acted in a fashion detrimental to the Debtor's interest.

### B.    Whether the Debtor Committed Fraud and/or Gross Mismanagement That Requires the Appointment of a Trustee for "Cause"

Wells Fargo argues that certain actions taken by the Debtor amounted to fraud or gross

mismanagement, necessitating the appointment of a trustee under § 1104(a)(1). In support of

this assertion, Wells Fargo argues that: (1) the Debtor lacks adequate internal controls; (2) the

Debtor failed to maintain adequate books and records; (3) the Debtor violated Cash Collateral

Orders; (4) the Debtor lacked adequate process for selecting new management; (5) the Debtor

lacks a strategic plan to pay back its bond debt; (6) the Debtor made unnecessary pre-petition

expenditures; (7) the payment to certain vendors without proper invoices is an indicia of fraud;

and (8) the Debtor made pre-petition payments post-petition. For the reasons set forth below, the

---

string among the Debtor, Team Illinois, and Ms. Gulli as support for this argument. (Ex. No. 14.) However, the
email from Ms. Gulli only appears to be advice and a statement of the Debtor's negotiation position, not evidence
that Ms. Gulli had an impact on those negotiations. Wells Fargo introduced no other evidence in support of its
argument. Ms. Gulli's actual role in these negotiations, if any, is unclear.

Court concludes that Wells Fargo failed to establish by clear and convincing evidence that the

Debtor's actions constitute fraud, gross mismanagement or "cause" for appointment of a trustee.

### 1. Whether the Debtor Lacks Adequate Internal Controls and Failed to Adhere to Those Controls

The Debtor's internal control procedures require that all checks of the Debtor are to be

signed by two people. (Ex. Nos. 3 & 17.) Wells Fargo introduced evidence that the Debtor did

not comply with its internal controls when it allowed Mr. Grewal to be the sole signatory on

numerous checks that were written just before the Petition Date. Those checks include the

following:

- Check No. 50086, payable to Metrolift, Inc. and dated February 21, 2013 (Ex. No. 22)
- Check No. 50145, payable to Sustainable Lighting Solutions, Inc. and dated February 22, 2013 (Ex. No. 103)
- Check No. 50146, payable to Business Office Systems and dated February 22, 2013 (Ex. No. 111)
- Check No. 50007, payable to JD Computers, Inc. written and dated February 14, 2013 (Ex. No. 109)
- Check No. 50051, payable to Centrum East West Arenas Ventures LLC and dated February 14, 2013 (Ex. No. 108)
- Check No. 50090, payable to Centrum East West Arenas Ventures LLC and dated February 21, 2013 (Ex. No. 107)
- Check No. 50084, payable to ICE Innovative Concepts in Entertainment and dated February 21, 2013 (Ex. No. 106)
- Check No. 50147, payable to Thom Infotech/FVC, Inc. and dated February 22, 2013 (Ex. No. 105)
- Check No. 50142, payable to MSI, Inc. and dated February 22, 2013 (Ex. No. 104)

The Court agrees with Wells Fargo that the Debtor violated its internal control policies

when only one person signed these checks. However, this violation of the internal controls alone

is not sufficient to establish that the Debtor's failure amounted to gross mismanagement or fraud.

For the reasons stated above, departure from its internal control policy was justified because

these expenses were necessary for the proper operation of the Rink.

### 2. Whether the Debtor Failed to Adhere to its Own Internal Control Policies When it Paid Certain Vendors without Official Invoices

The Debtor's internal control policy states, "[i]t is the policy to *only* pay from original invoices in hand, no statements or order acknowledgements will be allowed." (Ex. No. 17, p. 3.) Wells Fargo points to several instances when the Debtor violated this policy by paying several vendors without official invoices:

- MSI, Inc. was paid based upon an email, not a full invoice. (Ex No. 23.)
- Metrolift, Inc. was paid based upon a quotation/proposal. (Ex. No. 20.)
- Thom Infotech was paid based upon an unaccepted invoice. (Ex. Nos. 24, 25, & 26)
- Business Office Systems was paid based upon an email exchange, not a proper invoice. (Ex. No. 28)
- Innovative Concepts in Entertainment was paid based upon an undated pro forma invoice. (Ex. No. 113)

The Court agrees with Wells Fargo that the Debtor violated its internal control policies when it made payments to vendors from documents other than original invoices in hand. However, this violation of the internal controls by itself is not sufficient to establish that the Debtor grossly mismanaged its affairs or committed fraud. Instead, as previously discussed, prompt payment of these expenses was necessary for the safe and efficient operation of the Rink, and the Court finds that the Debtor's departure from its internal control policy in this instance was justified.

Mr. Cordes testified that the Debtor does not have in place either effective internal controls or a method for ensuring that management adheres to any such controls. In response, Mr. Pakter and Mr. Grewal both testified that the Debtor had been forced to recreate its books and records because the prior management company refused to turn over the Debtor's books and records when their services were terminated. Mr. Pakter testified that he has worked with the Debtor to improve and maintain proper internal controls and the Debtor has made and

implemented improvements to its internal control structure.   Thus, far from establishing gross mismanagement, the evidence showed that the Debtor has acted diligently to recreate and employ proper accounting and recording methods, despite the handicap imposed upon it by its prior management company.

### 3. Whether the Debtor Failed to Maintain Adequate Financial Records

Similarly, Wells Fargo argues that the Debtor failed to maintain accurate and complete financial records.  Specifically, Wells Fargo argues that for the financial periods of March 1-9, March 10-16, March 17-23, March 24-31, April 1-7, April 8-14 and April 15-21 of 2013 the Debtor failed to:  (1) reconcile its general ledger and bank accounts to reflect all activity that has occurred; (2) reconcile its pre-petition unsecured claims in its accounting system with those listed on its schedules; and (3) record ATM activity.  (See Exhibit Nos. 29-32, 36 & 38.)

The Debtor's response to this argument is the same as its response to Wells Fargo's arguments regarding lack of internal controls:  The Debtor was required to recreate its books and records when former management failed to turn over the Debtor's books and records to new management.  Mr. Pakter testified that these financial issues have now been resolved, and the Debtor now has procedures in place that allow it to maintain proper financial records.  Mr. Pakter testified that the Debtor's financial records are up to date through April 2013 and that the general ledger is currently balanced with the Debtor's bank statements.  Mr. Pakter stated because those records are now balanced, all previous months are necessarily balanced as well.  He concluded that it was his opinion that the Debtor now has control over its financial reporting system.

Mr. Cordes and Mr. Pakter next sparred over the following alleged accounting failures by the Debtor:

- Mr. Cordes argued that the Debtor failed to record operating revenues contemporaneously with receipt of payments.  Mr. Pakter again blamed the Debtor's need to reconstruct its financial records prior to the Petition Date.

- Mr. Cordes testified that the Debtor failed to reconcile revenue figures in its general ledger with revenue figures from Max Ice. However, as Mr. Pakter testified, Max Ice, the Debtor's Point of Sale revenue-recording system, and Quickbooks, the Debtor's general accounting software, do not record the same information and do not need to be reconciled with one another.

- Mr. Cordes also claimed that the Debtor did not reconcile bank statements with its general ledger. Mr. Pakter testified that this task had to await recreation of the Debtor's books and records, but that this has now been done and will continue to be done on a monthly basis. Mr. Pakter further testified that it was unnecessary under generally accepted accounting principles for a debtor of this size to balance its general ledger with its bank statements weekly.

- Mr. Cordes criticized the Debtor's failure to maintain accurate subsidiary ledgers, such as one for unpaid bills. However, as Mr. Pakter testified, because the general ledger now balances within $110, the subsidiary ledgers must also balance within $110.

- Mr. Cordes testified that the Debtor did not establish a disbursement process with imbedded approval procedures. The Court agrees with Mr. Cordes that the Debtor failed to abide by its internal control policies regarding disbursements. However, Mr. Pakter and Mr. Grewal both testified that they have redesigned the Debtor's internal controls and that the Debtor is making a good faith effort to comply with them.

- Mr. Cordes argued that the Debtor did not comply with its internal controls requiring reconciliation of its actual revenues with its bank records for the weeks of March 9, March 16, March 23, March 31, April 7, April 14, and April 21. Mr. Cordes also testified that the Rink's ATM activity was not recorded for the weeks of March 16, March 23, March 31, April 7, April 14, and April 21. Mr. Cordes also opined that the Debtor's general ledger was not reconciled for the weeks of March 9, March 16, March 23, March 31, April 7, April 14, and April 21. Mr. Pakter testified that weekly balancing of the Debtor's accounts was unnecessary. He further testified that reconciliation was delayed due to the need to recreate the Debtor's books and records from scratch, but that the accounts are now balanced and therefore these previous periods must also balance. The Court finds Mr. Pakter's testimony credible and concludes based thereon that the Debtor's previous failure to balance its accounts for these weeks is not sufficient to prove that the Debtor grossly mismanaged its affairs.

Wells Fargo also argues that there were discrepancies between the Debtor's accounting records and the documents it filed in connection with the bankruptcy case. The Court finds that these discrepancies were a direct result of the initial incompleteness of the Debtor's financial

records caused by prior management's refusal to turn over the Debtor's books and records. They are not evidence of gross mismanagement on the part of the Debtor.

### 4. Whether the Debtor Failed to Meet its Timely Financial Reporting Requirements

Wells Fargo argues that the Debtor has not timely met its financial reporting requirements. The Debtor does not dispute that its audited financial statements for June 30, 2011 were not issued until April 29, 2012. Further, the Debtor admits that it has failed to produce audited financial statements for the fiscal year ending June 30, 2012, which were due December 31, 2012. However, as previously stated, these failures are attributable to the refusal of the Debtor's prior board of managers to turn over the Debtor's books and records.

Thus, while the Court agrees with Wells Fargo that the Debtor has not timely met its financial reporting requirements, this violation, under the circumstances, does not establish by clear and convincing evidence that the Debtor grossly mismanaged its affairs. The evidence instead demonstrates that the Debtor's books and records were incomplete and in disarray as a result of actions taken by prior management—a defect which current management has diligently been trying to correct. Based upon this evidence, the Court finds that the Debtor is making a good-faith effort to meet its timely reporting requirements and that its past failures do not amount to gross mismanagement.

### 5. Whether the Debtor Violated the Cash Collateral Orders

Wells Fargo argues that the Debtor violated the terms of the Cash Collateral Orders and that these violations, in and of themselves, are evidence of gross mismanagement amounting to cause to appoint a trustee. Specifically, Wells Fargo complains that the Debtor paid expenses[13]

---

[13] Wells Fargo initially also argued that the Debtor's failure to meet to certain *revenue* targets for the months of March and April of 2013 amounts to a violation of the Cash Collateral Orders. This argument is without merit

above and beyond the 10% variance permitted by the Orders without seeking prior approval of the Court or Wells Fargo. (Ex. Nos. 4, 60, 61 & 115.) Resolution of this issue requires interpretation of the Cash Collateral Orders.

The Cash Collateral Orders state: "the Debtor may use Cash Collateral in excess of the amount designated for a particular line-item so long as the percentage of deviation for each line-item during any monthly period does not exceed ten percent (10%) per line-item *and, in addition,* does not exceed ten percent (10%) in aggregate...." (Ex. Nos. 34 & 35) (emphasis added).

Wells Fargo interprets this language in the disjunctive: That is, under Wells Fargo's interpretation, if the Debtor is either 10% over on a single line item *or* 10% over the aggregate budget, then the Debtor will have violated the Cash Collateral Orders. Wells Fargo argues that the Debtor's expenses for certain line items exceeded 10% of the budgeted amount for those particular items, even though the Debtor's overall expenses did not exceed 10% of the total expenses allowed under the cash collateral budget. Under Wells Fargo's interpretation of the Cash Collateral Orders, this violated those Orders.

The Debtor counters that Wells Fargo's argument fails because it is based upon a fundamental misinterpretation of the Cash Collateral Orders. Under the Debtor's analysis, the expense-variation language in the Orders must be read in the conjunctive, rather than the disjunctive: That is, under the Debtor's interpretation, it only violated those Orders if it incurred expenses of more than 10% over any single line item *and also* incurred total expenses which were 10% over the aggregate budget.

Mr. Grewal thus testified that he interpreted the Cash Collateral Orders to mean that the Debtor would be in violation of them only if its spending was 10% more than the budget for each

because the language in the Cash Collateral Orders governs expenses and not revenues.

line-item *and also* 10% above the budget for all line-items in the aggregate.[14]  He also testified

that the Debtor would never have agreed to the Cash Collateral Orders if they were going to be

interpreted as Wells Fargo believes they should because the Debtor did not have access to its

current payroll information when the agreed upon budget was created.  Because outdated payroll

information had to be used, he knew that there would be more than a 10% variance at least with

respect to the payroll line item.

The Court finds Mr. Grewal's trial testimony with respect to his understanding of the

Cash Collateral Orders credible.  The Court also finds that both the Debtor's and Wells Fargo's

interpretations of the Cash Collateral Orders are plausible.  The ambiguity surrounding the

interpretation of the Orders demonstrates that Wells Fargo has not established by clear and

convincing evidence that the Debtor violated the Cash Collateral Orders.[15]

In sum, the Court finds that the Cash Collateral Orders are properly interpreted in the

conjunctive, and that under this interpretation the Debtor did not violate them.  Wells Fargo has

therefore not established that the Debtor is guilty of gross mismanagement.  Consequently, the

Court finds that there is no "cause" warranting the appointment of a trustee.

### 6. Whether the Debtor's Process for Selecting New Management Constitutes Gross Mismanagement

Wells Fargo alleges that the Debtor failed to create necessary and ordinary processes for

the selection of management and therefore has grossly mismanaged its affairs.  According to Mr.

Cordes, the Debtor:  (1) had a flawed process with respect to hiring its new manager; (2) did not

---

[14] During the trial, Wells Fargo pointed out that Mr. Grewal testified at his deposition that the Debtor was in violation of the Cash Collateral Orders.  In his deposition, Mr. Grewal admitted to being in violation of the Cash Collateral Orders after he read Mr. Cordes's report.  However, he testified that he was uncomfortable with this testimony at the deposition, so he went back and looked at the Cash Collateral Orders and determined that the Debtor never violated that Cash Collateral Orders because the Orders should be read in the conjunctive.

[15] Even if the Court accepted Wells Fargo's interpretation of the Cash Collateral Orders, these particular violations would not amount to cause sufficient to warrant the appointment of a trustee.  Mr. Pakter testified that he worked with the Debtor and has revised its internal control policies to ensure compliance.  (*See* Ex. No. 87.)

confer with Wells Fargo; and (3) did not allow for an adequate transition period between the management companies. The Court finds that the transition period was sufficient to replace new management, particularly given the drastic steps that were quickly required to remedy the poor physical and financial condition at the Rink in December of 2012:  (1) there was a $1,000,000 default to the bondholders; (2) the real estate taxes on the Rink, years in arrears, had been sold, and then had to be redeemed; (3) the Board was unable to get CSCG to cooperate with respect to questions about payroll; (4) CSCG did not appear to be accurately reporting revenues for ATM, vending and concessions transactions; (5) the concessions area was being improperly sublet by CSCG; and (6) the Debtor's training facility (known as the "Pinnacle") was improperly staffed, stocked with unnecessary equipment and offered ineffective programs; these problems caused the Club and Team Illinois to quit using the Pinnacle, and that in turn led to reduced revenue.

Moreover, the evidence demonstrates that the Debtor went through a careful selection process when it selected and hired new management.  Mr. Grewal testified that the Debtor solicited proposals from three different management companies.  It received two proposals, reviewed them, and interviewed the two companies' personnel.  Ultimately, it selected and contracted with Fairview.  (Ex. No. 16.)  Mr. Grewal testified that the Debtor's board only replaced CSCG after it had completed this interview process.

Wells Fargo further argues that the Debtor also grossly mismanaged the management transition when it included an incentive compensation program in the new management service agreement, because that program jeopardized the Debtor's tax exempt status  However, Mr. Grewal testified that the Debtor's pre-petition counsel advised the Debtor that the management services agreement did not jeopardize the Debtor's tax exempt status.  He also testified that, at the request of Wells Fargo, the Debtor hired special counsel, Ungaretti & Harris, to review the

preservation of its tax exemption in light of Fairview's contract and to take such steps as counsel

may deem necessary to preserve the tax exemption. (Ex. No. 52.)

### 7. Whether the Lack of a Strategic Plan to Pay Back the Debtor's Bond Debt Constitutes Gross Mismanagement

Wells Fargo argues that the Debtor lacks a strategic plan to deal with its default on the

bond debt. But one of the Debtor's purposes in filing this case was to give it breathing room to

create a strategic plan to pay all of its debts, including debts owed to Wells Fargo. Wells Fargo's

concern with the lack of a plan at the inception of the proceedings is thus premature.

Furthermore, the Debtor provided evidence that it is capable of making progress towards paying

back the Bonds because revenues have increased since the Petition Date.[16] As Mr. Grewal noted,

the Debtor's amount of cash on hand increased from $74,000 as of the Petition Date to $400,000

as of May 2013.

Finally, Wells Fargo argues that the Debtor has not been transparent in its dealings with

Wells Fargo. No evidence was introduced that the Debtor was required to consult with Wells

Fargo with respect to the Debtor's management of the Rink. Nonetheless, the Debtor's

cooperation with Cordes & Company and the weekly reports generated by Cordes & Company

provided Wells Fargo with far more transparency than it enjoyed from prior management.[17]

---

[16] However, it is also undisputed that, in the past three years, there has been no payment to Wells Fargo or proposal of a formal plan to bring the debt current. The Court finds that this default in payment started under the prior management of the Debtor.

[17] Some of Wells Fargo's arguments appear to be internally inconsistent: Well Fargo has expressed confidence in prior management and lack of faith in Debtor's current management, despite the fact that prior management appears to have been responsible for letting the Rink deteriorate, for failing to keep proper books and records, for failing to turn over the books and records it possessed to new management, and for the growth of the payment defaults to Wells Fargo. By contrast, new management has actively worked to correct the harm caused by prior management. Part of the discrepancy appears to be tied to the fact that old management held monthly meetings with Wells Fargo, while new management has relied upon Mr. Cordes to act as the go-between with Wells Fargo. Given the importance of Wells Fargo's role to the future success or failure of the Debtor, the Court suggests that the Debtor would be well-advised to resume the monthly meetings with Wells Fargo that had been carried on by the Debtor's prior management.

### 8. Whether the Debtor's Pre-Petition Capital Expenditures Are Evidence of Gross Mismanagement

Mr. Cordes testified that it was not prudent for the Debtor to have made significant pre-petition capital improvements when it lacked the funds to do so and that, in any event, the Club rather than the Debtor should have absorbed those costs. However, there was no evidence to support the claim that the Debtor requires *any* of its licensees to finance capital improvements made to the Rink for the benefit of customers. The only documentary evidence bearing on this issue at all is the Debtor's written contract with Team Illinois. Tellingly, that contract does not require the licensee to absorb the costs of *general* capital improvements. (Ex. No. 13.) Because the Debtor does not require any of its licensees to absorb the costs of capital improvements it is unreasonable to assume that the Debtor would require the Club alone, among all of the licensees, to bear those costs.

Mr. Grewal also testified, without rebuttal from Mr. Cordes or any other witness, that in his best business judgment each of these expenditures was necessary in order to have a safe and properly operating business.[18] Based upon the unrebutted testimony of Mr. O'Dacre and Mr. Grewal, the Court concludes that the following expenditures were justified as being necessary for the financial health of the Debtor and for the safety and well-being of its customers:

- The purchase of the scissor lift lowered expenses because the Debtor no longer had to rent one from Metro Lift. Because the scissor lift allowed the Rink to ensure that the arenas would have proper working lighting, this purchase lessened the Debtor's potential tort liability. It also increased the value of the estate because the new lift was a more valuable asset than the malfunctioning scissor lift.

---

[18] Further Mr. Grewal explained the four-part analysis he went through in deciding whether to approve each of the challenged capital expenditures: (1) will this purchase increase the value of the estate; (2) will this purchase mitigate the Debtor's expenses; (3) will this purchase increase revenues; and (4) will this purchase mitigate liability? No testimony was offered that would call into question Mr. Grewal's use of these factors. Therefore, the Court finds these factors reasonable and in the Debtor's best business judgment.

31

- The purchase of new lighting lowered expenses because the Debtor no longer needed to replace expensive bulbs, the new lighting had an instant-on function that conserved energy, and ComEd gave the Debtor a $20,000 rebate. The purchase lessened the Debtor's potential tort liability because proper lighting in the arenas likely prevented injuries and also allowed the security cameras to capture clearer video. The $20,000 rebate increased the value of the estate.

- The repairs to the Rink's HVAC system lowered expenses because the Debtor would no longer pay for gas leaking into the Rink. These repairs also made more areas of the Rink usable by regulating the temperature of the locker rooms that had been too hot, and the office space that had been too cold, to be habitable. The repairs also lessened the Debtor's potential liability because the presence of a gas leak rendered the Rink unsafe for both patrons and employees.

- The repairs to and replacement of inoperable or missing security system equipment lessened the Debtor's potential liability. The main purpose of the security cameras is videotaping incidents that occur on the ice, possibly providing the Debtor with valuable evidence in mitigation of damages in the event of an incident or injury. A properly operating security system also inherently increases the value of the estate.

- The purchase of office furniture increased the value of the estate because the new furniture is an inherently valuable capital asset. It also allowed the Debtor to utilize space in the Rink more efficiently.

- The purchase of two arcade games installed in the lobby area increased the Rink's revenue and thereby the value of the Debtor's estate. Mr. Grewal testified that these games are usually successful at hockey rinks and typically generate revenue quickly.

- The repairs made to the cooling tower ensured proper ice levels and temperatures, thereby reducing the Debtor's utility costs. The Debtor's water bills were lower because the repaired tower no longer leaked approximately one gallon of water every minute. The cost of replacing the tower would have exceeded the cost of the repairs. These repairs also lessened the Debtor's potential tort liability because the improper ice levels were unsafe.

- The repairs to the boards and glass surrounding the arenas corrected conditions that made the Rink unsafe and a potential source of liability. These repairs also enhanced the value of the estate because they made the Rink more usable.

- The computer system upgrades allowed the Debtor to properly track concessions revenue. These upgrades have intrinsic worth, and therefore increased the value of the estate. They also have the potential to allow the Debtor to find and track revenue that was previously unknown.

- The use of outside employees lowered expenses because it allowed the Rink to operate without interruption while Fairview took over management of the Rink.

In conclusion, the Court finds that these capital expenditures were essential in order for the Rink to operate as a safe, efficient and successful business. The Court also finds no reason for the Debtor to have required the Club alone to absorb those costs. As a result, the Court finds that these expenditures do not amount to gross mismanagement.

### 9. Whether the Debtor's Post-Petition Payments of the Pre-Petition Expenses to Certain Vendors without Proper Invoices is Indicia of Fraud

Finally, Wells Fargo argues that the manner in which the Debtor paid certain pre-petition expenditures constitutes fraud.[19]  In particular, Wells Fargo argues that: (1) the Debtor made decisions to pay these expenses before filing bankruptcy although none of the vendors demanded early payments or prepayments; (2) the Debtor never asked Wells Fargo for its permission to make the payments; (3) the payments were made prior to the Petition Date in order to avoid the scrutiny of this Court and to drain cash from the estate; and (4) the Debtor attempted to create a false paper trail in order to justify these payments.

Section 1104(a) does not define fraud: "The cases in which fraud on the part of the debtor in possession justified the appointment of a trustee are not numerous and rest on clear and convincing facts." *In re F. A. Potts & Co.,* 20 B.R. 3, 5 (Bankr. E.D. Pa. 1981). Cases defining § 1104(a)(1) fraud do so by reference to state common law fraud elements. *See id.* Under Illinois law, the elements of fraud include: (1) a false statement of material fact; (2) the defendant's knowledge or belief that the statement was false; (3) intent to induce the other party to act; (4) the other party's justifiable reliance upon the statement; and (5) damage resulting from

---

[19] Mr. Cordes testified that in his opinion these actions displayed an intent to mislead Cordes & Company and Wells Fargo and opined that, taken together, they constituted strong indicia of fraud. The Court affords this portion of Mr. Cordes's opinion little weight. Whether or not fraud exists is an issue for the trier of fact to decide, not for an expert witness to opine upon. Mr. Cordes has exceeded the proper scope of expert testimony when he attempts to opine on an ultimate issue in the case. *See* Fed. R. Evid. 704.

such reliance. *Brown v. Real Estate Res. Mgmt., LLC (In re Polo Builders, Inc.)*, 388 B.R. 338, 375 (Bankr. N.D. Ill. 2008) (citing *Kapelanski v. Johnson*, 390 F.3d 525, 530–31 (7th Cir. 2004)). Wells Fargo must produce evidence that would allow this Court to conclude that each element has been established by clear and convincing evidence.

Wells Fargo's main charge of fraud centers on the Debtor's actions with respect to Thom Infotech. Wells Fargo's primary evidence for this alleged fraud is an email exchange between Michele Kackert, the Debtor's accountant, and Thom Infotech in which Ms. Kackert allegedly asked the vendor to backdate an invoice. (Ex. No. 24.) No testimony or evidence was offered by either party that would shed light on the actual intentions of the two parties to the email exchange. However, a reasonable interpretation of Ms. Kackert's email is that she wanted Thom Infotech's invoice to accurately reflect the date of purchase rather than the date of delivery. In addition, the invoice itself appears to be internally inconsistent because it contains dates that cannot be reconciled.[20] The Court finds this evidence insufficient to establish, by clear and convincing evidence, that Ms. Kackert, as an agent of the Debtor, committed fraud.

Wells Fargo also argues that an invoice from Innovative Concepts in Entertainment Inc. demonstrated that the Debtor committed fraud by allegedly demanding an altered invoice from the company. (Ex. No. 113.) Specifically, Wells Fargo argues that the pro forma invoice and the altered "paid by" date of the other invoice are sufficient to prove that the Debtor committed fraud. Because there was no evidence produced at trial that the dates of either invoice were altered at the request of the Debtor, the Court finds that Wells Fargo failed to prove by clear and convincing evidence that either invoice proves that the Debtor committed fraud.

Wells Fargo next alleges that Mr. Grewal backdated the check to Innovative Concepts,

---

[20] The invoice is dated February 25, 2013. However, the date for the individual items ordered is March 22, 2013. There was no explanation offered for this inconsistency.

and that such conduct amounts to fraud. (Ex. No. 106.) There was insufficient evidence adduced at trial that would allow this Court to conclude that Mr. Grewal in fact backdated that check and thus committed fraud. Wells Fargo argues that the inconsistencies between the invoice and the pro forma invoice, coupled with the check that was dated February 21, 2013 is enough to prove fraud. However, no testimony was offered that allows this Court to conclude anything other than the Debtor requested invoices that accurately depicted the timeline for this purchase.[21]

Next, Wells Fargo argues that certain emails between Mr. O'Dacre and MSI, Inc. sent on February 22, 2013, the Friday before the Petition Date, demonstrate that the Debtor was fraudulently attempting to create a false paper trail. In his email, Mr. O'Dacre stated to a representative of MSI, that "I need to get you paid today so if you have to inflate it to make sure everything is covered we can adjust moving forward. Get that to me asap." (Ex. No. 23.) Wells Fargo alleges that the term "inflate" used by Mr. O'Dacre shows that the Debtor was trying to falsify financial records.

Mr. O'Dacre testified that his use of the term "inflate" was a poor choice of words and that he should have used the word "estimate" instead. According to Mr. O'Dacre, the subject of the email was gas leaks at the Rink that the Debtor absolutely needed MSI to repair immediately. Those repairs took place on the weekend preceding the Petition Date. Because he viewed this as an emergency, Mr. O'Dacre wanted to make sure that MSI received sufficient funds to ensure immediate performance of the repair work. Wells Fargo further argues that MSI estimated its costs at $1,664, but the Debtor paid this vendor $4,000. Mr. O'Dacre testified that the original

---

[21] While one explanation of these facts may be that the Debtor asked Innovative Concepts in Entertainment to alter these invoices in order to avoid Court approval, an equally plausible explanation is that the Debtor simply wanted an accurate record of this transaction. Wells Fargo bears the burden of proving that this was fraud, and it has not met that burden.

quotation did not include an estimate of the work MSI was to perform over the weekend with respect to fixing the gas leaks, only the work completed up to February 22, 2013. The Court finds Mr. O'Dacre's testimony credible and concludes that the Debtor intended to pay for emergency work that needed to be completed over a weekend, not that it intended to mislead anyone or to commit fraud.

Wells Fargo further alleges that the Debtor committed fraud when it prepaid Metrolift, Inc. for a scissor lift that had not yet been delivered. Wells Fargo's evidence for this argument is: (1) the Debtor's check to Metrolift dated February 21, 2013 (Ex. No. 22); (2) Metrolift's quote dated February 25, 2013 (Ex. No. 20); and (3) Mr. O'Dacre's email to Metrolift stating, "I know you said there would be some wiggle room so see if you can let us have the unit we used for the last couple of weeks as the wiggle room and you keep the enclosed check. I think that would be fair and you have another new customer." (Ex. No. 21.)

Mr. O'Dacre testified that the purpose of his email was to ask Metrolift to waive the rental fee and accept the payment without such fee as a full payment for the scissor lift. The Court finds Mr. O'Dacre's explanation plausible and further finds that Wells Fargo did not prove by clear and convincing evidence that his conduct amounted to fraud.

Wells Fargo also argues that the Debtor also committed fraud through an email written by Mr. O'Dacre to a representative of Rink-Tec in which Mr. O'Dacre stated, "[w]e added a $1000 onto the one in case they filed 11 can you just use that as a credit going forward?" (Ex. No. 27.) Mr. O'Dacre testified that in his business judgment, a small advance to Rink-Tec, a new vendor, would help ensure that Rink-Tec would continue to work with the Debtor moving forward. The Court finds Mr. O'Dacre's explanation plausible and finds that his actions do not rise to the level of fraud.

Wells Fargo next argues that the Debtor's purchase of office furniture from Business Office Systems amounted to fraud. On February 22, 2013, Mr. O'Dacre sent the vendor an email stating, "[c]an you send over an invoice for the [Rink] furniture so we can [get] you paid. Keep it under $5000 and if you have [to] adjust later not a problem we want to cut the check today." (Ex. No. 28.) Mr. Grewal testified that the Debtor purchased office furniture in order to convert a single-desk room at the Rink into a three-desk office. Mr. O'Dacre testified that the Debtor used this vendor in the past and his email was intended to obtain the best deal he could on the purchase of the furniture. The evidence adduced at trial demonstrates that the Debtor paid for the office furniture on February 22, 2013. (*Id.*) The delivery date was not until mid-March of 2013, and the check was not cashed until that time. The Court concludes that those facts are insufficient to demonstrate that the Debtor committed fraud. (*See* Ex. Nos. 28 & 111.)

Finally, Wells Fargo argues that the Debtor's purchase of a lighting system from Sustainable Lighting Solutions, a vendor owned by a member of the Club, was fraudulent because the purchase was made without prior board approval. Mr. Grewal testified that, although the meeting minutes from February 13, 2013 did not show the board's approval of this purchase, he did recall discussions at that meeting where the board approved this purchase. The Court finds Mr. Grewal's testimony plausible and therefore finds that this purchase does not establish fraud on the part of the Debtor.

### 10. Whether the Debtor's Payment of Certain Pre-Petition Claims Post-Petition Constitutes Gross Mismanagement

In addition, Wells Fargo maintains that the Debtor improperly paid over $32,000 in pre-petition claims post-petition without Court approval, and those payments amount to gross mismanagement. (Ex. Nos. 29 & 30.) Of these payments, only two categories were significant

in amount:[22]

- The Debtor paid AHAI Officiating Committee Inc. $4,610.00. Mr. Grewal testified that AHAI is the governing body for amateur hockey and it provides officiating for the men's league games. Failing to pay AHAI would result in that organization withholding officials necessary to officiate men's league games. Without these games the Rink would lose approximately 10% of its revenue. Mr. Grewal's testimony demonstrated that failure to pay AHAI would have a significantly detrimental financial impact on the Debtor that warranted this payment.

- The Debtor paid Nicor Gas $13,577.88, Noble Energy $15,041.78, and ComEd $7,000.00. Mr. Grewal testified that these utility payments were necessary for the proper operation of the Rink. He further testified that these bills were going to be approved for payment by the Court, and in fact on March 12, 2013, the Court entered an order approving the Debtor's motion to provide adequate assurance of payment for continued utility service. (Ex. No. 49.) The Court agrees with Mr. Grewal that these payments were vital for the proper operation of the Rink. The Debtor's payment of these utilities, while made post-petition for pre-petition debts, was justified because failure to pay these bills would have a significant detrimental financial impact on the Debtor.

In sum, the Court finds that all of these payments were either *de minimus* in amount or vital to the proper operation of the Rink. None of them were evidence of gross mismanagement.

### 11. Whether All of the Actions Taken by the Debtor in the Aggregate Amount to "Cause" Including Fraud and/or Gross Mismanagement

Wells Fargo argues that the Court must look at the totality of the circumstances when determining if a debtor either grossly mismanaged its affairs or committed fraud. Thus, even though the Court has rejected each individual allegation of the Debtor's malfeasance, Wells Fargo insists that those allegations, when viewed as a whole, amount to gross mismanagement or fraud.

In determining the alleged malfeasance which should be viewed as a whole, the Court will exclude those allegations that Wells Fargo failed to establish as a factual matter that the

---

[22] Five of these payments totaled no more than $1,500. Given the insignificant amount of these transactions, the Court finds these *de minimus* payments do not demonstrate a violation of the financial record keeping that would rise to the level of gross mismanagement sufficient to warrant the appointment of a trustee. Further, one of the philosophies of Chapter 11 is that debtors should be given a second chance at business success. "Consistent with that philosophy, under normal circumstances current management should be permitted to identify and correct its past mistakes." A. Resnick & H. Sommer, 7 *Collier on Bankruptcy*, ¶ 1104.02[3][c][i] at 1104-11 (16th ed. 2013). Because the Debtor made a good faith effort to remedy this issue, the Court grants it a second chance.

Debtor: (1) lacked adequate process when it replaced management; (2) had a conflict of interest with the Club; (3) engaged in any self-dealing; or (4) violated the Cash Collateral Orders. Because Wells Fargo failed to establish any of these allegations, the Court will not consider them as part of the totality of the circumstances.[23]

When the remaining allegations of malfeasance are examined as a whole, they do not amount to proof of gross mismanagement or fraud. For example, the capital improvements made on the eve of bankruptcy were necessary for the safe and efficient operation of the Rink, thereby demonstrating good management rather than bad. Similarly, the Debtor's pre-petition payments of post-petition debts were either justified by business necessity or were *de minimus*. While these actions could be construed as mismanagement, they do not constitute *gross* mismanagement. Because "one would expect to find some degree of incompetence or mismanagement in most businesses which have been forced to seek the protections of chapter 11, the Court must find something more aggravated that simple mismanagement" in order to appoint a trustee. *Midlantic Nat'l Bank v. Anchorage Boat Sales, Inc. (In re Ancorage Boat Sales, Inc.),* 4 B.R. 635, 645 (Bankr. E.D.N.Y. 1980). In short, even when looked at as a whole, Wells Fargo's allegations of malfeasance are insufficient to establish that the Debtor either grossly mismanaged its affairs or was guilty of fraud.

### C. Whether Appointment of a Trustee is in the Interests of All Creditors, Equity Security Holders, and Other Interests of the Estate Under § 1104(a)(2)

Next, the Court will address whether the appointment of a trustee is warranted under § 1104(a)(2) because such an appointment "is in the interests of creditors, any equity security

---

[23] Similarly, because the Debtor's financial records were incomplete as a result of previous management, the Court will not consider these actions in the totality because it will not place blame on current management for the actions of previous management.

holders, and other interests of the estate...." 11 U.S.C. § 1104(a)(2). When discussing this

section of the Code, *Collier on Bankruptcy* states:

> Use of the word "and" suggests that creditors cannot on their own obtain
> the appointment of a trustee under this provision in order to disenfranchise
> equity security holders or other interests. Instead, appointment of a trustee
> must be in the interest of the estate generally in order to satisfy the
> statutory "interests" standard. Thus, when equity security holders or other
> ownership interests properly and in good faith support the debtor's current
> management, it will be difficult to obtain an order for the appointment of a
> trustee under the "interests standard," as such an appointment will
> presumably not be in the interest of equity.

A. Resnick and H. Sommer, *7 Collier on Bankruptcy*, § 1104.02[3][d][i], at 1104-15 (16th ed.

2013). The Court finds that § 1104(a)(2) must be read in the conjunctive, and that the

appointment of a trustee must be in the interests of equity security holders as well as creditors.

The Court finds that Wells Fargo has not shown by clear and convincing evidence that

the appointment of a trustee is necessary under § 1104(a)(2). The evidence offered at trial did

not establish that a trustee would be in the interests of any other creditors or equity security

holders.

In support of its request for the appointment of a trustee, Wells Fargo offered the

testimony of Ms. Housum, a vice president in the corporate trust department at Wells Fargo. She

testified that the Debtor replaced its prior management without consulting Wells Fargo and the

other bondholders. She further testified that under the Debtor's old management, there were

monthly conference calls between the Debtor and the bondholders, and there was "transparency"

with the old board. She stated that since the new management was put in place, those calls have

not taken place and the transparency has disappeared. Ms. Housum also testified that Wells

Fargo has no confidence in the Debtor's ability to manage the Rink because of a perceived

conflict of interest between the Debtor and the Club. In fact, she called the relationship

"incestuous." She further stated that there is now no working relationship between the Debtor and Wells Fargo. She also testified that the Debtor did not seek the approval of the bondholders before making all of the capital improvements at the Rink.

As previously stated, the Court rejects the argument that there is a conflict of interest between the Debtor and the Club or that the Club under its new management company acted to the Debtor's detriment. The Court finds Ms. Housum's testimony that the Debtor is not committed to paying back its bond debt speculative and unconvincing. The Debtor is not required to have a strategic plan in place to pay back the debt immediately upon filing its bankruptcy petition. As noted previously, one of the purposes of filing this case was to give the Debtor breathing room to create a strategic plan to pay back its debts. Further, the Debtor's default on its bond payments occurred under prior management, which has now been replaced, and the new management appears to be working diligently to address the multitude of problems faced by the Debtor.

Ms. Housum further stated that Wells Fargo is not receiving sufficient financial information from the Debtor. But this argument fails to take into account the critical role being played by Wells Fargo's expert witness, Mr. Cordes, and his company, Cordes & Company. Mr. Cordes has virtually unlimited access to the Debtor's books and records, and his company prepares detailed weekly reports for the benefit of Wells Fargo. In terms of the actual information received, it appears to the Court that Wells Fargo is receiving far more information from the new management of the Debtor than it received from the old, even though Ms. Housum clearly preferred the old management's way of conveying its information. Thus, the Court finds that Wells Fargo receives the information necessary to assess the Debtor's ability to manage the Rink.

Next, Ms. Housum testified that the Debtor does not have adequate cash controls in place. The Court agrees with Wells Fargo that under previous management insufficient internal controls were implemented to properly control the Debtor's cash. However, under new management, the Debtor has made a good faith effort to remedy this situation and has, with the help of Mr. Pakter, instituted new internal controls. The evidence demonstrated that since the Petition Date the Debtor increased its revenues and reduced its expenses, which suggests that the new regime has been effective.

This Court finds that the actions taken by the Debtor were necessary to address problems created by prior management. There was no evidence adduced at trial, other than Ms. Housum's unqualified opinion as to legal matters, that would allow this Court to find that an irreconcilable conflict of interest exists between the Club and the Debtor.

Relying on the case *In re Marvel Entm't Grp., Inc.,* 140 F.3d 463 (3d Cir. 1998), Wells Fargo argues that its lack of trust in the Debtor mandates appointment of a trustee. However, in *Marvel* the court stated, "[w]e expressly hold that there is no per se rule by which mere conflicts or acrimony between debtor and creditor mandate the appointment of a trustee." *Id.* at 473. This Court finds that the mere acrimony between Wells Fargo and the Debtor is insufficient to warrant the appointment of a trustee. The "intense and high-stakes bickering" present in that case is not present here. *See id.* at 474. The level of animosity between this Debtor and Wells Fargo does not reach the level of animosity that was present in the *Marvel* case.

Thus, the apparent break-down in communication between the Debtor's new board and Wells Fargo does not by itself constitute grounds necessary to appoint a trustee. Ms. Housum's testimony that she has lost confidence in the Debtor's ability to manage the Rink and is "skeptical" of any possibility to work with the Debtor is insufficient to demonstrate that

appointment of a trustee is in the interests of all creditors, equity security holders, and other interests of the estate. To the contrary, Ms. Housum admitted that she was unaware of the state of disrepair at the Rink under the old management even though she was at the facility in September 2012 and took a tour of the building.

Wells Fargo failed to produce sufficient evidence to demonstrate that its lack of confidence in the Debtor is so justified that it would be in the best interests of creditors, equity security holders, and other interests of the estate to appoint a trustee. In fact, most of the evidence adduced at trial should, if anything, help to restore Wells Fargo's confidence in the Debtor. Under new management the Debtor has: (1) repaired the abysmal conditions of the Rink; (2) reduced utility costs; (3) reduced the Rink's potential liabilities; (4) reconciled the Rink's financial records; (5) developed new internal controls; (6) increased revenues; and (7) begun the process of renegotiating contracts more favorable to the Debtor.

In conclusion, the Court, under the discretion afforded it by § 1104(a)(2), declines to appoint a trustee. The Court finds that Wells Fargo failed to show by clear and convincing evidence that it is in the interests of creditors, any equity security holders, and other interests of the estate to appoint a trustee.

## VI. CONCLUSION

For the foregoing reasons, the Court finds, based on the totality of the evidence, that Wells Fargo has not demonstrated by clear and convincing evidence that a Chapter 11 trustee should be appointed under § 1104(a)(1) or (a)(2). Wells Fargo has not demonstrated evidence of "cause" including fraud, gross mismanagement, or dishonesty on the part of the Debtor, or that it would be in the interests of creditors, equity security holders, and other interests of the estate to appoint a trustee.

ENTERED:

DATE: *July 16, 2013*

*Donald R. Cassling*

**Donald R. Cassling**
**United States Bankruptcy Judge**